Jon V. Harper (#1378)
**HARPER LAW, PLC**
P.O. Box 581468
Salt Lake City, UT  84158
Tel: (801) 910-4357
Email: jharper@jonharperlaw.com

[**Additional counsel on signature pages**]
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| ETHAN SILVERMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>                     Plaintiff,<br><br>       v.<br><br>MYRIAD GENETICS, INC., MARK C. CAPONE, and R. BRYAN RIGGSBEE,<br><br>                    Defendants. | **Case No. 2:19-cv-00707-PMW**<br><br>**Magistrate Judge Paul M. Warner**<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Ethan Silverman ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings,

wire and press releases published by and regarding Myriad Genetics, Inc. ("Myriad" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Myriad securities between September 2, 2016 and August 13, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Myriad was founded in 1991 and is headquartered in Salt Lake City, Utah. Myriad is a molecular diagnostic company that develops and markets predictive, personalized, and prognostic medicine tests worldwide.

3.     Myriad offers, among other products, GeneSight, a DNA genotyping test to aid psychotropic drug selection for depressed patients; and Foresight, a prenatal test in the expanded carrier screening market for future parents to assess their risk of passing on a recessive genetic condition to their offspring.  GeneSight is offered as both a psychotropic[1] test ("GeneSight

---

[1] The term "psychiatric" denotes a branch of medicine that deals with mental, emotional, or behavioral disorders, the term "psychotropic" denotes a type of drug that affects the mind.  For example, "psychotropic" drugs could be used in "psychiatric" treatment.  *See Definition of*

Psychotropic") and MTHFR (an enzyme required to convert folic acid and dietary folate into its active form, which is called l-methylfolate) test.

4.     On September 1, 2016, during after-market hours, Myriad announced that it had completed its acquisition of Assurex Health, Inc. ("Assurex") on August 31, 2016.  Myriad acquired GeneSight through this acquisition.

5.     On July 31, 2018, Myriad announced that it had closed its acquisition of Counsyl, Inc. ("Counsyl").  The acquisition of Counsyl provided Myriad with two new products—ForeSight and Prelude—in the expanded carrier screening and non-invasive prenatal testing markets, respectively.  The Company estimated that these markets would grow to approximately three million tests performed in the U.S. and $1.5 billion over the next five years.

6.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) GeneSight lacked evidence or information sufficient to support the tests in their current form, including their purported benefits; (ii) the U.S. Food and Drug Administration ("FDA") had requested changes to GeneSight and questioned the validity of the test's purported benefits; (iii) Myriad had been in ongoing discussions with the FDA regarding the FDA's requested changes to GeneSight; (iv) Myriad's acquisition of Counsyl—and thereby, Foresight—caused the Company to incur the risk of suffering from lower reimbursement for its expanded carrier screening tests, which had the potential to, and actually did, materialize into a material negative impact on the

*Psychiatry*, Merriam-Webster, https://www.merriam-webster.com/dictionary/psychiatry (last visited September 19, 2019); *Definition of Psychotropic*, Merriam-Webster, https://www.merriam-webster.com/dictionary/psychotropic (last visited September 19, 2019).

Company's revenue; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

7.     On August 13, 2019, during after-market hours, Myriad issued an earnings release, filed as an exhibit to a Current Report on Form 8-K with the SEC, wherein the Company reported its fiscal fourth quarter and full year 2019 financial results.  Therein, Mark C. Capone ("Capone"), Myriad's President and Chief Executive Officer ("CEO"), disclosed that "[u]nfortunately, revenue in the fourth quarter was two percent below expectations largely due to lower reimbursement for [the Company's] expanded carrier screening test"—*i.e.*, Foresight.

8.     Later that day, in an earnings conference call with investors and analysts, Defendant R. Bryan Riggsbee ("Riggsbee"), Myriad's Chief Financial Officer ("CFO"), revealed that "the FDA requested changes to the GeneSight test offering" after Myriad had provided the FDA with clinical evidence and other information to support GeneSight Psychotropic, and that the Company has "been in ongoing discussions with the FDA regarding its request."  Rigsbee continued by stating that "[a]lthough [Defendants] continue to disagree the changes to the tests are required, on August 10, 2019, [Defendants] submitted a proposal regarding the reporting of GeneSight test results to healthcare providers that we believe address the FDA's principal concerns."

9.     Also later that day, Myriad filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the fiscal year ended June 30, 2019 (the "2019 10-K").  In the 2019 10-K, Defendants disclosed that the FDA had questioned whether the validity of GeneSight's purported benefits had been established.  The 2019 10-K

also revealed that, since at least late 2018, the FDA had increasingly questioned the claims of marketed genetics tests, such as GeneSight.  Specifically, the 2019 10-K stated, in relevant part:

> The FDA has recently increased its attention to marketing of pharmacogenetic tests.  For example, *in late 2018, the FDA issued a safety communication regarding "[g]enetic laboratory tests with claims to predict a patient's response to specific medications, that have not been reviewed by the FDA and may not be supported by clinical evidence*."  Among other tests, the FDA notice cited "genetic tests that claim results can be used to help physicians identify which antidepressant medication would have increased effectiveness or side effects compared to other antidepressant medications" . . . . As explained by the FDA in its update to this safety communication, *the FDA reached out to several firms marketing such pharmacogenetic tests where the FDA believes the relationship between genetic variations and the medication's effects has not been established*, including a warning letter to Inova Genomics Laboratory.
>
> *Earlier in 2019, we provided the FDA with clinical evidence and other information to support our GeneSight Psychotropic test.  More recently, the FDA requested changes to the GeneSight test offering, and we have been in ongoing discussions with the FDA regarding its request.*  Although we continue to disagree that changes to the test are required, on August 10, 2019 we submitted a proposal regarding the reporting of GeneSight test results to healthcare providers that we believe addresses the FDA's principal concerns.  We believe this approach should not affect the benefits that we believe are provided by the GeneSight test.  However, we cannot predict with certainty the outcome of our interactions with the FDA or its timing, and whether the ultimate form of the test offering will have an adverse effect on our revenues from the test.

(Emphases added.)

10.     On this news, Myriad's stock price fell $19.05 per share, *or 42.76%—nearly half of the Company's total stock value*—to close at $25.50 per share on August 14, 2019.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

5

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Myriad is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

15.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.     Plaintiff, as set forth in the attached Certification, acquired Myriad securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.     Myriad is a Delaware corporation with its principal executive offices located at 320 Wakara Way, Salt Lake City, UT.  Myriad securities trade in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "MYGN".

18.     Defendant Capone has served as Myriad's President and CEO at all relevant times.

19.     Defendant Riggsbee has served as Myriad's CFO at all relevant times.

20.     Defendants Capone and Riggsbee are sometimes referred to herein as the "Individual Defendants."

21.     The Individual Defendants possessed the power and authority to control the contents of Myriad's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Myriad's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Myriad, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Myriad was founded in 1991 and is headquartered in Salt Lake City, Utah. Myriad is a molecular diagnostic company that develops and markets predictive, personalized, and prognostic medicine tests worldwide.

23.     Myriad offers, among other products, GeneSight, a DNA genotyping test to aid psychotropic drug selection for depressed patients; and Foresight, a prenatal test in the expanded

carrier screening market for future parents to assess their risk of passing on a recessive genetic condition to their offspring.  GeneSight is offered as both a psychotropic test and MTHFR test.

24.     On September 1, 2016, during after-market hours, Myriad announced that it had completed its acquisition of Assurex on August 31, 2016.  Myriad acquired GeneSight through this acquisition.

25.     On July 31, 2018, Myriad announced that it had closed its acquisition of Counsyl. The acquisition of Counsyl provided Myriad with two new products—ForeSight and Prelude—in the expanded carrier screening and non-invasive prenatal testing markets, respectively.  The Company estimated that these markets would grow to approximately three million tests performed in the U.S. and $1.5 billion over the next five years.

**Materially False and Misleading Statements Issued During the Class Period**

26.     The Class Period begins on September 2, 2016.  On September 1, 2016, during after-market hours, Myriad issued a press release announcing the Company's completed acquisition of Assurex on August 31, 2016 (the "September 2016 Press Release").   The September 2016 Press Release quoted Defendant Capone, who touted that Myriad's acquisition of Assurex had established the foundation for Myriad's neuroscience business and leveraged its existing preventative care business unit with the addition of GeneSight, which purportedly had significant growth potential.  Specifically, Defendant Capone stated, in relevant part:

> We are exceptionally pleased to close the Assurex Health acquisition as GeneSight® becomes our second largest product, with an outstanding growth trajectory, substantial current market potential, and the opportunity for expanded indications . . . . This acquisition is an excellent strategic fit since it leverages our existing preventive care business unit with the addition of a product that has a market potential of $3 billion in this channel.  The acquisition has the added strategic benefit of establishing the foundation for our neuroscience business where GeneSight has a market

potential of over $2 billion and the ability to leverage this sales channel
for future pipeline products.

27.     On August 9, 2017, Myriad filed an Annual Report on Form 10-K with the SEC,

reporting the Company's financial and operating results for the quarter and year ended June 30,

2017 (the "2017 10-K").  The 2017 10-K reaffirmed that "the acquisition [of Assurex]

establishe[d] the foundation for [Myriad's] neuroscience business and leverage[d] [the

Company's] existing preventative care business unit with the addition of . . . GeneSight," and

that GeneSight  had "significant growth potential."

28.     The 2017 10-K also touted GeneSight as a DNA test that optimized psychotropic

drug selection for neuroscience patients, helped healthcare providers prescribe medication, and

that GeneSight was clinically proven by multiple studies to double a patient's response rate to

medications selected with its aid.  Specifically, the 2017 10-K stated, in relevant part:

> **GeneSight®:** *DNA genotyping test to optimize psychotropic drug
> selection for neuroscience patients.*  Our GeneSight test helps healthcare
> providers take a personalized approach to prescribing medicine for
> patients.  Because genes influence the way a person's body responds to
> specific medications, the medications may not work the same for
> everyone. Using DNA gathered with a simple cheek swab, GeneSight
> analyzes a patient's genes and provides individualized information to help
> healthcare providers select medications that better match their patient's
> genes. Multiple clinical studies have shown that when clinicians used
> GeneSight to help guide treatment decisions, patients were up to twice as
> likely to respond to the selected medication compared to standard of care.

(Emphases in original.)

29.     Additionally, the 2017 10-K asserted that GeneSight met a significant unmet

clinical need in the neuroscience market, was the leading product for psychotropic drug

selection, was used by healthcare providers to help patients with a large swath of

neuropsychiatric conditions, including chronic pain, and was clinically proven to enhance medication selection. Specifically, the 2017 10-K stated, in relevant part:

> In the neuroscience market, our GeneSight test meets a significant unmet clinical need and is the leading product for psychotropic drug selection. It is used by healthcare providers to help patients who are affected by neuropsychiatric conditions including depression, anxiety, ADHD, bipolar disorder, schizophrenia, post-traumatic stress disorder (PTSD) and other behavioral health conditions, as well as chronic pain. The test is clinically proven to enhance medication selection, helping healthcare providers get their patients on the right medication faster.

30.     Appended as an exhibit to the 2017 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that "[t]he [2017 10-K] of the Company fully complie[d] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and the information contained in the [2017 10-K] fairly present[ed], in all material respects, the financial condition and results of operations of the Company."

31.     On July 31, 2018, Myriad issued a press release announcing the closing of Myriad's acquisition of Counsyl (the "July 2018 Press Release"). The July 2018 Press Release quoted Defendant Capone, who touted the Counsyl acquisition's strategic benefits, which would substantially enhance Myriad's presence in the women's health market. Specifically, Defendant Capone stated:  "We are excited to welcome Counsyl to Myriad and begin the integration process . . . . This acquisition is an excellent strategic fit and enables us to become the premier Women's Health organization and a trusted advisor for the highest quality genetic tests."

32.     On August 24, 2018, Myriad filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended June 30, 2018 (the "2018 10-K"). The 2018 10-K touted Myriad's acquisition of Counsyl, especially as it

had led to the Company's acquisition of, *inter alia*, Foresight, purportedly enhancing the Company's business through the expanded carrier screening market.  Specifically, the 2018 10-K stated, in relevant part:

> During the fourth quarter, we signed a definitive agreement to acquire Counsyl, Inc. a global leader in reproductive genetic testing for total consideration of $408.6 million through a combination of cash and our stock. The acquisition closed on July 31, 2018. The acquisition of Counsyl provides Myriad with two new products, ForeSight$^{TM}$ and Prelude$^{TM}$, in the expanded carrier screening [and] non-invasive prenatal testing markets, respectively. We estimate that these markets will grow to approximately 3 million tests performed in the United States and $1.5 billion over the next five years.

33.     The 2018 10-K also contained substantively the same representations as quoted in ¶¶ 27-29 above, with one notable modification.  Where the 2017 10-K touted that "[m]ultiple clinical studies have shown that when clinicians used GeneSight to help guide treatment decisions, patients were ***up to twice*** as likely to respond to the selected medication compared to standard of care," the 2018 10-K dialed down these statements and merely asserted that "[m]ultiple clinical studies have shown that when clinicians used GeneSight to help guide treatment decisions, patients were ***more likely*** to respond to the selected medication compared to standard of care" (emphases added).  It is unclear from the modified language whether the previous "[m]ultiple clinical studies" had overstated GeneSight's impact and new clinical studies had since tempered those results, or, rather, whether the same "[m]ultiple clinical studies" were referenced in both the 2017 10-K and the 2018 10-K, and it was Myriad that had previously overstated GeneSight's impact.

34.     Additionally, the 2018 10-K highlighted "results from the GeneSight GUIDED randomized controlled trial at the American Psychiatric Association annual meeting," asserting

that "[t]he landmark study showed that patients receiving GeneSight had significantly better outcomes with a 50 percent increase in remission rates and a 30 percent increase in response rates relative to those who received standard of care therapy."

35.   Appended as an exhibit to the 2018 10-K were signed SOX certifications, wherein the Individual Defendants certified that "[t]he [2018 10-K] of the Company fully complie[d] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and the information contained in the [2018 10-K] fairly present[ed], in all material respects, the financial condition and results of operations of the Company."

36.   Even as Myriad approached the end of the Company's fiscal year for 2019, Defendants continued to tout GeneSight for psychotropic purposes as currently administered. For example, in Myriad's Quarterly Report on Form 10-Q filed with the SEC on May 8, 2019, which reported the Company's financial and operating results for the Company's third quarterly period ended March 31, 2019 (the "3Q 2019 10-Q"),  the Company championed GeneSight's administration through several purported landmark psychiatric studies, stating, in relevant part:

> During the quarter ended September 30, 2018, the results of the GeneSight IMPACT study were published in the *Journal of Psychiatric Research*. In the study, patients treated by primary care physicians had 27 percent greater symptom improvement, 35 percent increased response and 63 percent greater remission than those treated by psychiatrists.
>
> * * *
>
> During the quarter ended December 31, 2018, the results of the GeneSight GUIDED study, the largest pharmacogenomics study ever in depression, was accepted for publication in the Journal of Psychiatric Research. The key finding of the study was that patients were 50 percent more likely to achieve remission and 30 percent more likely to respond to treatment when their medication selection was guided by the GeneSight Psychotropic genetic test.

37.     The statements referenced in ¶¶ 26-36 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) GeneSight lacked evidence or information sufficient to support the tests in their current form, including their purported benefits; (ii) the FDA had requested changes to GeneSight and questioned the validity of the test's purported benefits; (iii) Myriad had been in ongoing discussions with the FDA regarding the FDA's requested changes to GeneSight; (iv) Myriad's acquisition of Counsyl—and thereby, Foresight—caused the Company to incur the risk of suffering from lower reimbursement for its expanded carrier screening tests, which had the potential to, and actually did, materialize into a material negative impact on the Company's revenue; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

38.     On August 13, 2019, during after-market hours, Myriad issued an earnings release, filed as an exhibit to a Current Report on Form 8-K with the SEC, wherein the Company reported its fiscal fourth quarter and full year 2019 financial results.  Therein, Capone disclosed that "[u]nfortunately, revenue in the fourth quarter was two percent below expectations largely due to lower reimbursement for [the Company's] expanded carrier screening test"—*i.e.*, Foresight.

39.     Later that day, on an earnings conference call with investors and analysts, Defendant Riggsbee revealed that "the FDA requested changes to the GeneSight test offering"

after Myriad had provided the FDA with clinical evidence and other information to support GeneSight Psychotropic, and that the Company has "been in ongoing discussions with the FDA regarding its request."  Rigsbee continued by stating that "[a]lthough [Defendants] continue to disagree the changes to the tests are required, on August 10, 2019, [Defendants] submitted a proposal regarding the reporting of GeneSight test results to healthcare providers that we believe address the FDA's principal concerns."

40.     Also later that day, Myriad filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the fiscal year ended June 30, 2019. In the 2019 10-K, Defendants disclosed that the FDA had questioned whether the validity of GeneSight's purported benefits had been established.  The 2019 10-K also revealed that, since at least late 2018, the FDA had increasingly questioned the claims of marketed genetics tests, such as GeneSight.  Specifically, the 2019 10-K stated, in relevant part:

> The FDA has recently increased its attention to marketing of pharmacogenetic tests.  For example, ***in late 2018, the FDA issued a safety communication regarding "[g]enetic laboratory tests with claims to predict a patient's response to specific medications, that have not been reviewed by the FDA and may not be supported by clinical evidence***."  Among other tests, the FDA notice cited "genetic tests that claim results can be used to help physicians identify which antidepressant medication would have increased effectiveness or side effects compared to other antidepressant medications" . . . . As explained by the FDA in its update to this safety communication, ***the FDA reached out to several firms marketing such pharmacogenetic tests where the FDA believes the relationship between genetic variations and the medication's effects has not been established***, including a warning letter to Inova Genomics Laboratory.
>
> ***Earlier in 2019, we provided the FDA with clinical evidence and other information to support our GeneSight Psychotropic test.  More recently, the FDA requested changes to the GeneSight test offering, and we have been in ongoing discussions with the FDA regarding its request.***  Although we continue to disagree that changes to the test are required, on

August 10, 2019 we submitted a proposal regarding the reporting of GeneSight test results to healthcare providers that we believe addresses the FDA's principal concerns. We believe this approach should not affect the benefits that we believe are provided by the GeneSight test. However, we cannot predict with certainty the outcome of our interactions with the FDA or its timing, and whether the ultimate form of the test offering will have an adverse effect on our revenues from the test.

(Emphases added.)

41.     On this news, Myriad's stock price fell $19.05 per share, *or 42.76%—nearly half of the Company's total stock value*—to close at $25.50 per share on August 14, 2019.

42.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Myriad securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Myriad securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds

or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Myriad or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

47.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Myriad;

- whether the Individual Defendants caused Myriad to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Myriad securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

49.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Myriad securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Myriad securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

50.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

51.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

52.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

53.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

54.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Myriad securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Myriad securities and options at artificially inflated prices.  In furtherance of

18

this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

55.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Myriad securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Myriad's finances and business prospects.

56.      By virtue of their positions at Myriad, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

57.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Myriad, the Individual Defendants had knowledge of the details of Myriad's internal affairs.

58.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Myriad.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Myriad's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Myriad securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Myriad's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Myriad securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

59.    During the Class Period, Myriad securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Myriad securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Myriad securities was substantially lower than the prices paid by

Plaintiff and the other members of the Class.  The market price of Myriad securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

60.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

61.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

62.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

63.     During the Class Period, the Individual Defendants participated in the operation and management of Myriad, and conducted and participated, directly and indirectly, in the conduct of Myriad's business affairs.  Because of their senior positions, they knew the adverse non-public information about Myriad's misstatement of income and expenses and false financial statements.

64.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Myriad's

financial condition and results of operations, and to correct promptly any public statements issued by Myriad which had become materially false or misleading.

65.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Myriad disseminated in the marketplace during the Class Period concerning Myriad's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Myriad to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Myriad within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Myriad securities.

66.     Each of the Individual Defendants, therefore, acted as a controlling person of Myriad.  By reason of their senior management positions and/or being directors of Myriad, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Myriad to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Myriad and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

67.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Myriad.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  September 27, 2019

**HARPER LAW, PLC**

*/s/      Jon V. Harper*
Jon V. Harper (Bar No. 1378)
P.O. Box 581468
Salt Lake City, UT 84158
Tel: (801) 910-4357
Email: jharper@jonharperlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*