THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| IN RE MYRIAD GENETICS, INC. SECURITIES LITIGATION | **MEMORANDUM DECISION AND ORDER GRANTING [86] LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Case No. 2:19-cv-00707-DBB<br><br>District Judge David Barlow |

Los Angeles Fire and Police Pensions ("LAFPP") brings a proposed class action against Myriad Genetics Inc. ("Myriad") and various executives for alleged violations of Section 10(b) of the Exchange Act and Rule 10b-5 for securities fraud, Section 20(a) of the Exchange Act for liability of controlling persons, and Sections 10(b) and 20A of the Exchange Act and Rule 10b-5 for insider trading.[1] LAFPP seeks class certification, appointment of LAFPP as the representative of the proposed class, and appointment of Bernstein Litowitz Berger & Grossman LLP ("BLB&G") as class counsel.[2] Because LAFPP has met the class-certification requirements of Federal Rule of Civil Procedure 23, the motion for class certification is GRANTED.

**BACKGROUND**

---

[1] *See* Amended Complaint, ECF No. 34.
[2] Lead Plaintiff's Motion for Class Certification, ECF No. 82 at 25.

LAFPP was an investor in 956,326 shares of Myriad stock that suffered losses after the stock declined in value.[3] LAFPP alleges that Myriad artificially inflated the value of their stock by making misrepresentations about developments of certain biotechnology before the truth emerged.[4] Now, LAFPP brings a securities fraud, controlling-persons liability, and insider trading action against Myriad and certain executives for violations of Sections 10(b), 20(a), and 20A of the Exchange Act.[5]

LAFPP seeks to certify a class of investors under Federal Rule of Civil Procedure 23 consisting of "all persons who purchased or acquired Myriad common stock from August 9, 2017 until February 6, 2020, inclusive . . . and who were damaged thereby."[6]

## STANDARD

Federal Rule of Civil Procedure 23(a) allows for class certification only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."[7] "A party seeking class certification must show 'under a strict burden of proof' that all four requirements are clearly met."[8]

---

[3] ECF No. 9-3 at 4.
[4] *See* ECF No. 34 at ¶¶ 156–98.
[5] *Id* ¶¶ 314–38.
[6] ECF No. 82 at 2. The proposed class excludes Defendants, any current or former officers or directors of Myriad, the immediate family members of any Defendant or current or former officer or director of Myriad, and any entity that any Defendant owns or controls, or owned or controlled, during the class period. *Id.* at 2 n.2.
[7] Fed. R. Civ. P. 23(a)(1)–(4). These requirements are known as the "numerosity," "commonality," "typicality," and "adequacy" requirements.
[8] *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006) (quoting *Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir. 1888)).

If a party moving for class certification shows that the four requirements of Rule 23(a) are met, it must also show that the suit is maintainable as a class action under one of the three categories of suits described in Rule 23(b). One of these is a suit in which the movant shows "that the questions of law or fact common to class members predominate over any question affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[9]

## DISCUSSION

### I.   LAFPP has shown that it meets the requirements for class certification under Rule 23(a).

To obtain class certification, LAFPP must first show that the numerosity, commonality, typicality, and adequacy requirements are met.[10] Defendants only contest that LAFPP has failed to meet the adequacy requirement of Rule 23(a).[11] Nonetheless, the party seeking class certification bears the burden of showing under a strict burden of proof that all four Rule 23(a) requirements are clearly met.[12] As such, the court will consider if LAFPP has met this burden with respect to each of the elements in turn.

### A.   LAFPP has shown that it meets the numerosity, commonality, and typicality requirements.

First, LAFPP must show that "the class is so numerous that joinder of all members is impracticable."[13] "There is 'no set formula to determine if the class is so numerous that it should be so certified.'"[14] Rather, the court engages in a fact-specific inquiry to determine if the number

---

[9] Fed. R. Civ. P. 23(b)(3).
[10] Fed R. Civ. P. 23(a).
[11] Opposition to Lead Plaintiff's Motion for Class Certification, ECF No. 96 at 7.
[12] *Trevizo*, 455 F.3d at 1162.
[13] Fed. R. Civ. P. 23(a)(1).
[14] *Trevizo*, 455 F.3d at 1162 (quoting *Rex v. Owens ex rel. State of Okla.*, 585 F.2d 432, 436 (10th Cir. 1978)).

of putative class members is "such an overwhelmingly large number as to be prohibitive of joinder."[15] This court has previously held that "[t]he numerosity requirement of Rule 23 is satisfied in a securities fraud case if the stock at issue is nationally traded."[16] Here, LAFPP has presented evidence that Myriad had issued more than 68 million shares of common stock during the proposed class period with an average weekly trading volume on the Nasdaq Global Select Market of 950,000 shares.[17] Given that Myriad stock was nationally traded and that there were over 68 million shares of common stock outstanding during the proposed class period, joinder of all putative class members in this securities-fraud action would be impracticable.

Second, LAFPP must show that "there are questions of law and fact common to the class."[18] LAFPP need only present "a single common question" of law and fact to meet the commonality requirement.[19] LAFPP makes three distinct claims. Its Rule 10b-5 claim for securities fraud requires proof of (1) a material misrepresentation or omission by the defendant, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation.[20] In a securities-fraud case under Rule 10b-5, all the claims at issue will depend upon the question of whether the defendants made "any untrue statement of a material fact. . . ."[21] In the complaint, LAFPP alleges that Myriad and its officers made several untrue statements of

---

[15] *Trevizo*, 455 F.3d at 1162.
[16] *McEwen v. Digitran Sys., Inc.*, 160 F.R.D. 631, 636 (D. Utah 1994) (holding that numerosity was established in a securities fraud case where the stock was nationally traded and there were over two million shares of common stock outstanding).
[17] Hartzmark Rept., ECF. No 87 at ¶¶ 24–26.
[18] Fed. R. Civ. P. 23(a)(2).
[19] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (citations omitted).
[20] *Erica P. John Fund, Inc. v. Halliburton Co.* (*Halliburton I*), 563 U.S. 804, 809–10 (2011).
[21] 17 C.F.R. § 240.10b-5(b).

material fact including, for example, that its genetic test was "clinically proven to enhance medication selection,"[22] that a clinical trial "proved the test significantly improved clinical outcomes for depression patients whose doctors prescribed psychotropic drugs recommended by the test,"[23] and that "the FDA was 'well aware' that [the test] was unique among competitors in that its efficacy was demonstrated by a randomized controlled clinical trial . . . and thus Myriad's product was safe from FDA action."[24] Whether these alleged statements were untrue statements of material fact are questions common to the putative class. Thus, LAFPP has met the commonality requirement for its securities fraud claim.

The controlling persons liability claim requires proof of "(1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person."[25] The controlling persons claim will depend on whether there was a primary violation of securities laws and, as discussed above, the violation of securities laws is based on a question of whether the Defendants made untrue statements of material fact. This question is common to the putative class; thus, the commonality requirement is met for the controlling persons claim.

LAFPP's insider trading claim requires proof that a defendant purchased or sold a security of any issuer "on the basis of material nonpublic information about that security or issuer, in breach of a duty of trust or confidence that is owed directly, indirectly, or derivatively to the issuer of that security or the shareholders of that issuer, or to any other person who is the

---

[22] ECF No. 34 at ¶ 56.

[23] *Id.* ¶ 73.

[24] *Id.* ¶ 126. There are numerous other common factual claims pertaining to Defendants' alleged conduct which were reviewed and discussed in the court's opinion denying the Defendants' Motion to Dismiss. *See* Memorandum Decision and Order Denying Defendants' Motion to Dismiss, ECF No. 73 at 15–33 (reviewing the Plaintiff's allegations of untrue or misleading statements at complaint ¶¶ 56, 57, 59, 175 221 222 224); *Id.* at 33–51 (reviewing the Plaintiff's allegations of scienter at complaint ¶¶ 62–65, 221–23).

[25] *Adams v. Kinder-Morgan*, 340 F.3d 1083, 1107 (10th Cir. 2003).

source of the material nonpublic information."[26] Thus, all insider trading claims at issue here depend on whether a defendant owed a duty of trust or confidence to the issuer of a security, which is a question of law common to every member of the putative class. The commonality requirement is met here as well.

Third, LAFPP must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."[27] Typicality is satisfied "if the named plaintiffs' claims arise from the same events or practices giving rise to the claims of other class members and are based on the same law."[28] Here, LAFPP makes three claims: securities fraud, controlling persons liability, and insider trading.[29] These claims arise from the Defendants' alleged materially misleading statements, as well as trading securities while in possession of material non-public information.[30] Any proposed class claims would also rely on these theories and would arise from the same allegedly materially misleading statements and securities trading facts. For example, a putative class member could have purchased Myriad stock because of Myriad's November 7, 2017 statement that the GUIDED study data "clearly demonstrates the clinical utility of the GeneSight test,"[31] and now could seek to bring a securities fraud claim based on that allegedly untrue statement. Thus, LAFPP has satisfied the typicality requirement.

---

[26] 17 C.F.R. § 240.10b5-1(a).
[27] Fed. R. Civ. P. 23(a)(3).
[28] *Miller v. Basic Research, LLC*, 285 F.R.D. 647, 656 (D. Utah 2010); *Penn v. San Juan Hosp.*, 528 F.2d 1181, 1189 (10th Cir. 1975) ("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right so long as the claims of the plaintiffs and the other class members are based on the same legal or remedial theory.").
[29] ECF No. 34 at ¶¶ 314–38.
[30] *Id.*
[31] ECF No. 34 at ¶ 96.

**B. LAFPP has shown that it will fairly and adequately represent the interests of the class.**

The final Rule 23(a) requirement to certify a class is that the party moving for class certification must show that "the representative parties will fairly and adequately protect the interests of the class."[32] The Tenth Circuit has identified two questions important to the adequacy inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"[33]

In this case, LAFPP asserts that it has no conflicts of interest with other class members,[34] and Myriad has not presented any evidence of conflicts of interest. Rather, Myriad contends that LAFPP will not fairly and adequately protect the interests of the class because LAFPP "lacks sufficient knowledge about the class action" and has "abdicat[ed] its duties to counsel."[35]

"In a complex lawsuit . . . the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative."[36] "Only if the class representatives' 'participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case' should they fail to meet the adequacy of representation requirement."[37] This court has previously found that a proposed class representative would adequately protect the interests of the class where the proposed representative has read and reviewed the initial complaint, is aware

---

[32] Fed R. Civ. P. 23(a)(4).
[33] *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002); *In re Nature's Sunshine Product's Inc. Sec. Litig.*, 251 F.R.D. 656, 657 (D. Utah 2008).
[34] ECF No. 82 at 13
[35] ECF No. 96 at 7.
[36] *Nature's Sunshine*, 251 F.R.D. at 658 (quoting *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003)).
[37] *Id.* (quoting *Morris v. Wachovia Sec., Inc.*, 223 F.R.D. 284, 2963 (E.D. Va. 2004)).

of the nature of a class action, is aware of its role as a class representative and is willing to undertake that role, and will continue to communicate with counsel about the status of litigation and case strategies.[38]

Here, Raymond Ciranna, the General Manager of Los Angeles Fire and Police Pensions, testified that LAFPP has "analyzed in detail its potential legal claims against Myriad and certain of its senior officers"; "conducted a comprehensive and competitive selection process . . . to choose the Lead Counsel"; "reviewed the draft Complaint and authorized its filing"; "reviewed and authorized the filing of Lead Plaintiff's successful opposition to Defendants' motion to dismiss"; "negotiated, through its counsel, the scope of certain discovery and a case schedule"; and "propounded discovery," and "analyzed and authorized the filing of [LAFPP's] motion seeking its appointment as Lead Plaintiff and the appointment of Bernstein Litowitz as its chosen Lead Counsel."[39] But Myriad points to statements by Ciranna in his deposition testimony that it contends contradict Ciranna's declaration and indicate that LAFPP would be an inadequate class representative because it lacks knowledge about the action and has abdicated its duties to counsel.[40]

First, Myriad asserts that the duties that Ciranna claims that LAFPP carried out, such as reviewing the complaint and analyzing potential legal claims, were actually conducted by LAFPP's counsel.[41] Myriad claims that "[LAFPP's] abdication of its duties began when it

---

[38] *Nature's Sunshine*, 251 F.R.D. at 658.
[39] Ciranna Decl., ECF No. 88 at ¶ 6.
[40] Unredacted Opposition to Class Certification, ECF No. 100 at 8.
[41] ECF No. 100 at 8; Ciranna Dep., ECF No. 101 at 254:6–255:15 ("Paragraph 6 and 7 [of the Declaration] refers not only to the Board but also the City attorney. . . . the City attorney is charged with these activities along with expert counsel.").

outsourced the identification of potential claims."[42] While LAFPP did use two independent firms to monitor potential securities litigation, Ciranna testified that, after the securities-monitoring firms bring concerns to the LAFPP Board, "the Board gets to weigh in on whether there's anything of merit. . . . if the Board determines that an action should be taken . . . then through the City attorney there will be a solicitation to all of the firms that are on the securities litigation list or panel."[43] Thus, it is LAFPP's Board, not any monitoring firm or outside counsel, that makes the final determination of whether to initiate securities litigation. This arrangement is distinct from the monitoring arrangements that Myriad notes are disfavored by some courts. In two of the cases Defendants cite, *Iron Workers Local* and *In re Kosmos Energy*, the courts found that the subject monitoring agreements fostered lawyer-driven litigation because the same firm that performed monitoring services would also carry out the securities litigation, which created an incentive for the monitoring firm to recommend legal action.[44] In contrast, the monitoring firms here are not guaranteed to represent LAFPP should the Board initiate legal action, and there is a separate solicitation process in the event of litigation. Indeed, the monitoring firms which brought the claims to LAFPP's attention are not LAFPP's counsel in this action. The fact that LAFPP used a monitoring firm does not evince abdication of its duties when LAFPP made the ultimate determination of whether to bring legal action and when the monitoring firms were distinct from the firm that would represent LAFPP in the securities litigation.

---

[42] ECF No. 100 at 9.
[43] ECF No. 101 at 197:22–198:3.
[44] *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitizations, LLC*, 616F. Supp. 2d 461, 464 (S.D.N.Y. 2009); *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 149 (N.D. Tex. 2014).

Next, Myriad argues that "while [LAFPP] appeared to understand its responsibility to monitor the class action . . . the [Board] did little more than blindly follow advice of counsel."[45] But Ciranna's testimony demonstrates that LAFPP did more than blindly follow counsel. Ciranna testified that the Board made the initial determination of whether it should initiate legal action.[46] The Board, along with the City Attorney, reviewed proposals from law firms seeking to represent LAFPP and selected a law firm for this litigation.[47] The Board reviews and discusses the lawsuit at each stage of the litigation process at its regular Board meetings.[48] LAFPP reviewed the complaint before it was filed and provided information to the City Attorney in preparation for filing the complaint.[49] LAFPP collected documents for production during the course of litigation.[50] And Ciranna testified that the Board has ultimate authority over the law firms in the litigation and meets with lead counsel when "certain milestones . . . come up" to discuss next steps and how the Board needs to prepare or take particular actions.[51] Myriad contends that LAFPP abdicated its duties to counsel by relying on counsel to draft the complaint, motions, and filings in this action, but provides no legal support for the proposition that a plaintiff abdicates its responsibility when it provides information to its legal counsel and then

---

[45] ECF No. 100 at 10. Myriad also cites to deposition testimony in which Ciranna states that "up until . . . this point in time as far as the deposition, the Board has not had much interaction [with counsel]." *Id.* at 211:5–25. But Ciranna immediately clarifies that, while there was little interaction between the Board and counsel during the drafting of the motion for class certification and the opposition to the motion to dismiss (which involved back and forth between counsel and the city attorney about language and strategy in briefing), the Board gets updates at major milestones and will retain oversight over the ultimate decisions in the litigation. *Id.* at 212–13.

[46] ECF No. 101 at 197:22–198:3 ("[T]he Board gets to weigh in on whether there's anything of merit. And at that point, if the Board determines that an action should be taken and then through the City attorney there will be a solicitation to all of the firms that are on the securities litigation list or panel.").

[47] *Id.* at 201:12–19 ("Those proposals are reviewed by the City attorney but also by the Board.").

[48] *Id.* at 209:24–211:4.

[49] *Id.* at 215:11–15, 217:13–24.

[50] *Id.* at 223:14–24.

[51] *Id.* at 213:11–22.

relies on the counsel to draft the filings themselves. In sum, Ciranna's testimony does not indicate that LAFPP has completely abdicated its duties to counsel and instead demonstrates that LAFPP has maintained an active presence in the litigation process.

Furthermore, while Ciranna did testify that the City Attorney undertook litigation-related activities before presenting its "input, advice, analysis, assessment, [and] recommendations" to the board of the pension fund,[52] the City Attorney is a "city department"[53] that "supports the Board in all legal matters,"[54] not outside legal counsel. Ciranna also testified that the board receives reports from both the Lead Counsel and the City Attorney about the litigation's progress and that, when meeting, the Board carefully considers the materials presented.[55] Furthermore, Ciranna testified that, while the Board relies on counsel's advice, it has "ultimate authority over [the law firms] in connection with the litigation."[56] Defendant provide no apposite binding or persuasive legal authority suggesting that, in evaluating its potential legal claims, it was an abdication of responsibility for LAFPP to rely on the City Attorney while participating in the process and retaining final decision-making authority. Doing so here does not reveal that LAFPP has completely abdicated its duties as class representative.

Myriad also claims that LAFPP would not adequately represent the interests of the class because it lacks sufficient knowledge about the class action.[57] Myriad points to deposition testimony in which Ciranna was unable to identify witnesses cited in the Amended Complaint,[58]

---

[52] ECF No. 101 at 254:6–255:15.
[53] *Id.* at 77:6–7.
[54] *Id.* at 254:24–255:1.
[55] *Id.* at 211:23–212:6.
[56] *Id.* at 213:11–14.
[57] ECF No. 100 at 11–12.
[58] ECF No. 100 at 11; ECF No. 101 at 229:23–230:2, 232:19–22, 234:19–23.

unable to confirm what information these witnesses provided in support of the allegations in the complaint,[59] and unable to identify the name of the expert used to support LAFPP's motion for class certification.[60] Myriad also highlights that Ciranna could not testify knowledgeably about the alleged purchases or sales in Myriad stock.[61] But Ciranna's deposition testimony demonstrated adequate knowledge of the case. Ciranna testified about the nature of LAFPP's claims against Myriad and about how LAFPP believes Myriad violated federal securities laws.[62] Ciranna specifically identified Myriad's alleged misstatements that give rise to the action.[63] And Ciranna was able to explain specifically which statements in Myriad's press release were false or misleading.[64] The record does not support Myriad's claim that LAFPP lacks sufficient knowledge about the case to adequately serve as class representative, even though he could not answer all of counsel's questions.

In contrast to the cases that Myriad cites, LAFPP has demonstrated that it has sufficient knowledge of the case and sufficient participation in the litigation process to adequately serve as class representative. In *Tucker v. BP America Production Co.*, the court held that a proposed class representative was inadequate where "[plaintiff] had done no personal investigation into the Plaintiff Trust's claims" and "plaintiff could not identify a single provision of any of his leases which he claims were breached by defendant."[65] In *Kelley v. Mid-America Racing Stables*, the proposed plaintiff had an "almost total lack of familiarity with the facts of their case" and had

---

[59] ECF No. 100 at 11; ECF No. 101 at 230:24–231:1, 233:3–14, 235:6–16.
[60] ECF No. 100 at 11; ECF No. 101 at 222:14–19.
[61] ECF No. 100 at 11; ECF No. 101 at 96:3–12, 98:21–24, 111:8–13.
[62] ECF No. 101 at 236:2–237:9.
[63] *Id.* at 241:11–243:2.
[64] *Id.* at 244:22–245:4, 246:17–247:12.
[65] *Tucker v. BP Am. Prod. Co.*, 278 F.R.D. 646, 655 (W.D. Okla. 2011).

"no personal knowledge, other than given to him by counsel, of any wrongdoing or misrepresentations made by any defendant."[66] And in *Miller v. Calvin*, the court noted that a plaintiff cannot be an adequate class representative where he or she gives counsel "totally unfettered discretion."[67] This case is not like those cited by Defendants. Here, Ciranna, on behalf of LAFPP, was able to specifically identify Myriad's alleged misrepresentations that give rise to the action[68] and noted that while the Board relies on counsel's advice, it has "ultimate authority over [the law firms] in connection with the litigation."[69] While Ciranna's knowledge of the litigation is not complete, it is sufficient for the purposes of adequacy. LAFPP neither demonstrates an "almost total lack of familiarity with the facts of their case" nor has given counsel "totally unfettered discretion."[70] LAFPP has shown that it will fairly and adequately protect the interests of the class and has satisfied the requirements for class certification of Rule 23(a).

Furthermore, LAFPP has also demonstrated that BLB&G is adequate to serve as lead counsel. In appointing class counsel, the court considers "the work counsel has done in identifying or investigating potential claims in the action"; "counsel's experience in handling class actions"; "counsel's knowledge of the applicable law"; and "the resources that counsel will

---

[66] *Kelley v. Mid-America Racing Stables, Inc.*, 139 F.R.D. 405, 409–10 (W.D. Okla. 1990).

[67] *Miller v. Calvin*, No. 82-C-2253, 1984 U.S. Dist. LEXIS 21057, at *7 (D. Colo. Dec. 20, 1984).

[68] ECF No. 101 at 241:11–243:2.

[69] *Id.* at 213:11–14.

[70] Furthermore, neither *Berger v. Compaq Computer Corp.* nor *Smyth v. China Agritech* are persuasive here. In *Berger*, the Fifth Circuit noted that there is an emphatic Congressional command "that competent plaintiffs, rather than lawyers," direct class actions—as discussed above, there is no evidence that LAFPP has abdicated its oversight of the lawsuit to counsel. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 484 (5th Cir. 2001). And in *Smyth*, the plaintiff did not show that it was "willing to vigorously prosecute [the] action. *Smyth v. China Agritech, Inc.*, No. CV 13-03008-RGK, 2013 WL 12136605, at *5–6 (C.D. Cal. Sept. 26, 2013). Here, LAFPP has vigorously prosecuted the action, having overseen and prosecuted the case through multiple stages of litigation including defeating a motion to dismiss.

commit to representing the class."[71] LAFPP selected BLB&G after receiving proposals from and interviewing multiple law firms, and BLB&G has since diligently prosecuted the class action and defeated a motion to dismiss.[72] LAFPP has produced BLB&G's firm resume that indicates that the firm has substantial experience conducting securities class action litigation and has successfully prosecuted class actions such as the one at issue here.[73] Furthermore, LAFPP avers, and Myriad does not dispute, that BLB&G has no conflicts of interest with other class members.[74] LAFPP has demonstrated that BLB&G has committed resources to prosecuting Plaintiffs' claims and representing the class, and that the firm has knowledge and experience in handling securities class actions. Accordingly, BLB&G meets the adequacy requirement and the requirements of Rule 23(g).

## II.   LAFPP has shown that it is entitled to class certification under Rule 23(b)(3) because questions of law and fact common to class members predominate over individual ones and a class action is a superior method for adjudicating the controversy.

A party seeking class certification must also satisfy one of the requirements of Rule 23(b).[75] In this case, LAFPP argues that it satisfies the requirements of Rule 23(b)(3).[76] Rule 23(b)(3) allows for class certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the

---

[71] Fed. R. Civ. P. 23(g)(1)(A).
[72] *See* ECF No. 73.
[73] *Id.* at 14, ECF No. 83-1.
[74] ECF No. 82 at 13.
[75] Fed. R. Civ. P. 23(b).
[76] ECF No. 82 at 15.

controversy."[77] Defendants offer no specific fact or legal arguments or authorities on the issues of predominance and superiority.

The first Rule 23(b)(3) requirement is that questions of law and fact common to class members predominate over questions affecting only individual members. To determine if class issues predominate over individual issues, the court "*characterize[s]* the issues in the case as common or not, and then *weigh[s]* which issues predominate.[78] If a proposed class member will need to present evidence that varies from member to member to make a prima facie case, then it is an individual question.[79] But if the same evidence will suffice for each member to make out a prima facie case, then the question is common to the class.[80] LAFPP makes three claims: a Rule 10b-5 securities-fraud claim, a controlling-persons liability claim, and an insider trading claim. The court will examine these claims in turn.

A Rule 10b-5 claim for securities fraud requires proof of (1) a material misrepresentation or omission by the defendant, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation.[81]

The first element of the securities fraud claim, that the defendant made a material misrepresentation or omission, is common to the class because the same evidence, that of a defendant's material misrepresentation or omission, will suffice for members of the class

---

[77] Fed. R. Civ. P. 23(b)(3).
[78] *CGC Holdings Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014) (emphasis in original).
[79] *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).
[80] *Id.*
[81] *Halliburton I*, 563 U.S. 804, 809–10 (2011).

generally to make a prima facie case.[82] The second element, scienter, is also a class-wide issue

because evidence of the Defendants' states of mind will suffice for class members to make a

prima facie case.[83] The third element, a connection between the misrepresentation or omission

and the purchase or sale of a security, is a class-wide issue because evidence that the Defendants'

alleged misrepresentations were made in connection with the sales and purchases of securities

will suffice for each plaintiff's prima facie case.[84] The fourth element, reliance, could require

individual determinations as to each plaintiff, and "whether common questions of law or fact

predominate in a securities fraud action often turns on the element of reliance." [85] The court will

analyze whether reliance is an individual issue below. The fifth element, economic loss, could

require individualized determinations as to each plaintiff, but these calculations are mechanical

and formulaic. LAFPP offers a routinely accepted "out of pocket" damages model that could be

used to calculate damages on a class wide basis.[86] Even if individualized issues predominate on

the issue of damages, common questions of fact and law regarding the more complex liability

issues may still predominate.[87] The court finds that the complex liability issues do indeed

predominate over the more discrete and mechanical damages issue. The final element, loss

causation, is "the causal connection between the material misrepresentation and the economic

---

[82] The alleged misrepresentations and discussed in detail in the court's earlier opinion denying Defendants' Motion to Dismiss. *See* ECF No. 73 at 15–33. That portion of the opinion is incorporated herein by reference.

[83] The allegations regarding scienter also are identified and discussed in the aforementioned order, which is incorporated herein by reference. *See* ECF No. 73 at 33–52.

[84] *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 160–61 (2008) (noting that the "in connection with" language "defines the statute's coverage rather than causation.").

[85] *Halliburton I,* 563 U.S. at 810.

[86] ECF No. 87 at ¶¶ 88–94. ("This common methodology and the related inputs are applied on a class-wide basis. In the end, the inputs or the daily levels of artificial inflation (i.e., the artificial inflation ribbon) along with the actual trading activity of Class Members are used to calculate individual damages in a mechanical and formulaic manner.").

[87] *See In re Motor Fuel Temperature Sales Practices Litig.*, 279 F.R.D. 598, 613–14 (D. Kan. 2012).

loss suffered by investors."[88] Loss causation "addresses a matter different from whether an investor relied on a misrepresentation. . . . by contrast, [it] requires a plaintiff to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss."[89] Accordingly, loss causation is a class-wide issue because evidence that a misrepresentation caused a drop in Myriad's stock price will suffice for each plaintiff to show that he or she suffered an economic loss. Whether common questions of law and fact predominate over questions affecting only individual members of the putative class thus turns on the element of reliance.

The Supreme Court allows a party seeking class certification to invoke a presumption that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at market price may be considered to have done so in reliance on the misrepresentation."[90] If a party can invoke this presumption, then reliance is capable of resolution on a common, class-wide basis.[91] To invoke this presumption, the party seeking class certification must demonstrate that the alleged misrepresentations were publicly known, that the stock is traded in an efficient market, and that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed.[92]

LAFPP alleges, and Myriad does not dispute, that the alleged misrepresentations at issue here were made publicly.[93] With respect to the timing of stock purchases, LAFPP has presented

---

[88] *Halliburton I,* 563 U.S. at 808 (internal quotations omitted).
[89] *Id.* at 812.
[90] *Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 573 U.S. 258, 283–84 (2014). This is known as the "fraud-on-the-market theory."
[91] *Id.* at 276.
[92] *Halliburton I,* 563 U.S. at 811.
[93] *See, e.g.*, ECF No. 34 at ¶¶ 221–304.

evidence that it purchased stock in Myriad between when the misrepresentations were made and when the alleged truth was revealed, and the proposed class is defined for the same period.[94] The only remaining requirement for LAFPP to invoke the fraud-on-the-market theory is for it to show that Myriad's stock is traded in an efficient market.

Generally, courts look to considerations, known as the *Cammer* factors, to determine whether securities are traded in an efficient market.[95] These include:

> (1) average trade volume; (2) number of securities analysts following the stock; (3) number of market makers; (4) whether the company was entitled to file an S–3 Registration Statement; and (5) evidence of a cause and effect relationship between unexpected news and stock-price changes.[96]

The court will examine the factors in turn.

The first factor is whether "there existed an average weekly trading volume during the class period in excess of a certain number of shares."[97] In *Cammer*, the court found that an average weekly trading volume of two percent or more of outstanding shares would justify a strong presumption of an efficient market,[98] and in *Nature's Sunshine* the court found that an average weekly trading volume of 2.7% of outstanding shares would justify such a finding.[99] In this case, during the class period, Myriad stock had an average weekly trading volume of 6.3% of outstanding shares.[100] The first factor weighs in favor of a presumption of an efficient market.

---

[94] *See* ECF No. 9-2.
[95] *In re Nature's Sunshine Product's Inc. Sec. Litig.*, 251 F.R.D. 656, 662 (D. Utah 2008) (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1285–87 (D.N.J. 1989)).
[96] *Id.*
[97] *Id.* (quoting *Cammer*, 711 F. Supp. at 1286.)
[98] *Cammer*, 711 F. Supp. at 1286.
[99] *Nature's Sunshine*, 251 F.R.D. at 662.
[100] ECF No. 87 at ¶ 26.

The second factor is whether a number of securities analysts followed the stock, which supports efficiency because if more analysts disseminated information about the stock, the "market price of the stock would be bid up or down to reflect the financial information contained in the [company] reports. . . ."[101] Generally, more than six analysts following a security is enough for the second factor to weigh in favor of a presumption of an efficient market. LAFPP has presented evidence that at least ten research analysts followed Myriad stock during the class period.[102] Furthermore, over 2,300 articles discussed Myriad during the class period.[103] The second factor also weighs in favor of a presumption of an efficient market.

The third factor is the number of market makers—a market maker is a "brokerage house that announces itself ready to buy or sell a specified number of shares at specified prices."[104] "Ten market makers for a security would justify a substantial presumption that the market for a security is an efficient one."[105] Here, Myriad had at least 12 active market makers.[106] The third factor weights in favor of a presumption of an efficient market.

The fourth factor is whether the company was eligible to file an S-3 registration statement; this is relevant because "the SEC permits registration only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary."[107] Myriad was eligible to file an S-3 registration statement and filed a shelf

---

[101] *Cammer*, 711 F. Supp. at 1286.
[102] ECF No. 87 at ¶ 29.
[103] *Id.* ¶ 32.
[104] *Nature's Sunshine*, 251 F.R.D. at 663 (citations omitted).
[105] *Cammer*, 711 F. Supp. at 1293 (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988)).
[106] ECF No. 87 at ¶ 42.
[107] *Nature's Sunshine*, 251 F.R.D. at 663 (internal quotations omitted).

registration on Form S-3 on August 1, 2018, one year into the proposed class period.[108] This factor generally weighs in favor of a presumption of an efficient market.

The final factor is whether stock prices regularly reacted to new public information.[109] LAFPP has presented a report in which its expert conducted an "event study" to determine if Myriad's stock price reacted to new information about the company.[110] LAFPP's expert separated days into "news days," or days with company earnings and guidance announcements, and "no-news days."[111] He concluded that "Myriad's common stock price exhibited a statistically significant abnormal price reaction on 81.8% of news days (9 of 11) compared to *just* 5.3% of no-news days (33 of 618)."[112] This statistical correlation corresponds to a rejection of the hypothesis that Myriad's stock price reacted no differently on news days with 99.999% confidence.[113] Myriad provided no evidence to rebut this assessment. Accordingly, the fifth factor also weighs in favor of a presumption of an efficient market.

All five *Cammer* factors weigh in favor of a presumption of an efficient market based on this record. Thus, LAFPP may rely on the "fraud-on-the-market" presumption to establish that questions of reliance are capable of resolution on a class-wide basis. Common questions of reliance predominate in LAFPP's securities fraud action and LAFPP has met the first Rule 23(b)(3) requirement for the Section 10(b) and Rule 10b-5 claim.

---

[108] ECF No. 87 at ¶ 48. A shelf registration is a process that allows a company to file with the SEC with no present intent to sell the securities in the registration. *See In re Thornburg Morg., Inc. Sec. Litig.*, 824 F. Supp. 2d 1214, 1273 (D.N.M. 2011).
[109] *Nature's Sunshine*, 251 F.R.D. at 663–64.
[110] *See* ECF No. 87 at ¶¶ 60–78.
[111] *Id.* ¶ 69.
[112] *Id.* ¶ 75 (emphasis in original).
[113] *Id.*

LAFPP also brings a controlling-persons liability claim that requires proof of "(1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person."[114] As discussed above, common questions of law and fact predominate with respect to LAFPP's 10(b) securities fraud claim, and thus common questions of law and fact predominate regarding the first element of LAFPP's controlling-persons liability claim. The second element of the controlling-persons liability claim, that a defendant had control over the primary violator, is a class-wide issue because proof that a defendant had control over Myriad will suffice to make a prima facie case for every plaintiff. Thus, the requirements of Rule 23(b)(3) are satisfied with respect to LAFPP's controlling-persons liability claim.

LAFPP's final claim is an insider trading claim. Section 20A of the Securities Exchange Act authorizes damages against "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information."[115] To meet the statutory requirements, the complainant must have "contemporaneously with the purchase or sale of securities that is the subject of such violation, . . . purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class."[116] Additionally, "[c]ourts have interpreted § 20A as requiring the plaintiff to plead a predicate violation of the 1934 Act or its rules and regulations," such as a Section 10(b) claim.[117]

As noted above, common questions of fact and law predominate on the predicate 10(b) violation, so they would predominate on the insider trading claim as well. Similarly, proof

---

[114] *Adams v. Kinder-Morgan*, 340 F.3d 1083, 1107 (10th Cir. 2003).
[115] 15 U.S.C. § 78t-1(a).
[116] *Id*.
[117] *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1194 n.5 (10th Cir. 1998).

regarding whether Defendants Capone and Riggsbee were "purchasing or selling a security while in possession of material, nonpublic information"[118] will be the same for class members generally. Thus, the requirements of Rule 23(b)(3) are satisfied with respect to LAFPP's insider trading claim.

The second Rule 23(b)(3) requirement is that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[119] In considering whether this requirement is met, courts are directed to assess the following factors:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.[120]

Myriad does not dispute that a class action is a superior method of adjudicating this controversy, but the court will nonetheless analyze the above factors.

First, most potential class members have likely suffered losses that are not of sufficient magnitude to justify bringing action individually. During the class period, there was an average weekly trading volume of 4,591,192 shares of stock, which equates to an average weekly turnover of 6.3% of outstanding shares.[121] Myriad's stock price began the class period at $27.98, peaked at $50.34,[122] and closed the class period at $21.02.[123] LAFPP has identified at least 544 institutions that held Myriad common stock at some point during the class period,[124] and the fact

---

[118] 15 U.S.C. § 78t-1(a).
[119] Fed. R. Civ. P. 23(b)(3).
[120] *Id.* R. 23(b)(3)(A)–(D).
[121] ECF No. 87, Ex. I.
[122] *Id.* at ¶ 52, n. 81.
[123] ECF No. 34 at ¶ 31.
[124] ECF No. 87, Ex. V.

that Myriad common stock was traded on the Nasdaq Global Select Market, the most restrictive Nasdaq listing tier by market capitalization, gives rise to the inference that there were thousands of individual investors who owned significantly fewer shares of Myriad common stock and who have suffered losses not of sufficient magnitude to justify bringing action individually.[125] Thus, the first factor weighs in favor of adjudicating the controversy as a class action.

Second, LAFPP claims, and Myriad does not dispute, that it is not aware of other litigation asserting these claims on behalf of individual class members.[126] The second factor also weighs in favor of adjudicating the controversy as a class action.

Third, it is desirable to concentrate the litigation of claims against Myriad in this forum, because Myriad has its principal executive offices in Salt Lake City, Utah.[127] This will promote efficient access to documents, witnesses, and court proceedings. This factor also weighs in favor of adjudicating the controversy as a class action, though the court finds that it has relatively little weight.

Finally, the parties have identified no likely difficulties in managing this case as a class action. The court notes that class actions obviously entail additional complexity and generally take considerably more time than non-class action litigation, but these inherent properties of class actions do not amount to particular difficulty for this specific proposed class action. Thus, a class action is a superior method of resolving this controversy, and LAFPP has met the requirements of Rule 23(b)(3).

---

[125] ECF No. 87 at ¶ 39 ("The greater stringency means that companies on the NASDAQ Global Select Market have the largest number of shareholders, average monthly trading volume, unrestricted publicly held shares, market values, and number of market makers.").
[126] ECF No. 82 at 25.
[127] ECF No. 34 at ¶ 38.

III.   **The class period runs through February 6, 2020, because Myriad's February 6 disclosure of lower-than-expected revenue and the departure of its CEO was a corrective disclosure.**

In a securities class action, the class period ends "when curative information is publicly announced or otherwise effectively disseminated to the market."[128] LAFPP proposes a class period from August 9, 2017 until February 6, 2020.[129] On February 6, 2020, Myriad released a press release announcing its CEO's departure from the company, that it was "experiencing serious challenges obtaining reimbursement from the payor for administering the [GeneSight] test," and that "it had a significant revenue shortfall, 'well below[its] financial guidance for the quarter' due to 'lower-than-anticipated GeneSight cash collections from UnitedHealthcare.'"[130] On February 6, Myriad also "lowered its guidance for the remainder of fiscal 2020 from $810 million to $735 million . . . to account for GeneSight's poor revenue contribution."[131]

Myriad claims that the February 6th disclosure "has no bearing on any of the allegedly false and misleading statements in the complaint" and that the departure of the CEO was not "curative or corrective of any of the purportedly false or misleading statements in the complaint."[132] But Myriad fails to address the other information in the February 6th disclosure— the new information that Myriad was experiencing challenges obtaining reimbursement for the GeneSight test and the new revenue projections that were $75 million lower than previously disclosed. This information in the disclosure is enough for the court to preliminarily find at the class certification stage that the February 6th disclosure was a curative disclosure.

---

[128] *In re Ribozyme Pharms., Inc. Sec. Litig.*, 205 F.R.D. 572, 579 (D. Colo. 2001).
[129] ECF No. 82 at 2.
[130] ECF No. 34 at ¶ 194–96.
[131] *Id.* at ¶ 196.
[132] ECF No. 96 at 14, 15.

Additionally, the contemporaneous and apparently sudden departure of the CEO bolsters

the use of February 6th as the end of the class period. LAFPP alleges that the departure of

Myriad's CEO was abrupt and announced without any immediate successor, suggesting that his

departure was not part of an orderly succession plan.[133] The complaint alleges:

> The market was shocked by Capone's sudden departure and understood that it signaled that the cornerstone of Myriad's growth strategy – GeneSight – was in even greater jeopardy than previously disclosed. Indeed, particularly given the Company's other disclosures, investors understood that the evidence for GeneSight was so weak that even UnitedHealth was now providing virtually no meaningful coverage for the test.[134]

LAFPP explains that securities analysts linked the sudden departure of the CEO to Myriad's

declining Genesight revenue:

> For instance, in a February 7, 2020 report, Barclays analysts stated, "The biggest update was that CEO Mark Capone has resigned effective immediately, with CFO Bryan Riggsbee named interim CEO." These analysts further stated, "On the payor front, Myriad lowered expectations for the new UnitedHealth contract which covers GeneSight. Specifically, the company disclosed that a new prior authorization policy with UnitedHealth means there was almost no contribution to GeneSight sales from the coverage decision which started on 10/1/2019." Likewise, Jefferies analysts issued a February 7, 2020 report highlighting the "abrupt CEO departure . . . . Concurrent with the 2Q print, MYGN announced the abrupt resignation of CEO Mark Capone, who leaves the company after a 17-year tenure and 5 years as CEO." The analysts noted that Capone "oversaw much of MYGN's diversification push to shift the business away from hereditary cancer," including the acquisition and development of GeneSight, which had not "come close to hitting [its] deal models."[135]

A Cowen report from February 6, 2020 noted that "[i]t is tough to have confidence in [Myriad's]

leadership team and to confidently believe that we really know what is going on with the

business given a litany of obfuscations."[136] Finally, the complaint alleges: "In response to this

---

[133] ECF No. 34 at ¶ 197.
[134] *Id.*
[135] *Id.*
[136] ECF No. 107-6 at 1.

news, Myriad's stock declined more than 28%, from $29.29 at the close of market on February 6, 2020 to close at $21.02 on February 7, on high trading volume."[137]

Contrary to Myriad's assertion that "the Complaint fails to allege that the departure was curative or corrective of any of the purportedly false or misleading statements,"[138] the complaint alleges that the February 6th resignation was a curative disclosure[139] and the evidentiary record as it currently stands supports this conclusion, at least in combination with the significantly reduced revenue and acknowledgement of difficulties with GeneSight reimbursements. In contrast to the disclosure in the *West Virginia Pipe* case that Myriad cites, which "did not present any new facts to the market,"[140] Myriad's disclosure of lower than anticipated revenue, trouble with GeneSight coverage, and sudden announcement of the departure of a long-time CEO appear to have been new and important facts to the market. Based on the current evidentiary record at class certification, the appropriate class period runs through February 6, 2020.

## ORDER

LAFPP's motion for class certification is GRANTED. It is further ORDERED that the class of plaintiffs is defined as followed:

- All persons who purchased or acquired Myriad common stock from August 9, 2017 until February 6, 2020, inclusive, and were damaged thereby;

- Excluded from the Class are (a) Defendants; (b) any current or former officers or directors of Myriad; (c) the immediate family members of any Defendant or any current

---

[137] *Id.* ¶ 198.
[138] ECF No. 96 at 14.
[139] ECF No. 34 at ¶ 3.
[140] *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 295 (D. Minn. 2018).

or former officer or director of Myriad; and (d) any entity that any Defendant owns or controls or owned or controlled during the class period.

It is further ORDERED that LAFPP is appointed as Class representative.

It is further ORDERED that Bernstein Litowitz Berger & Grossman LLP is appointed as lead class counsel for all purposes in this action.

It is further ORDERED that the parties shall meet and confer on the form and manner of providing notice, and within 60 days of this order, submit their proposal for notice to the Class to the court for approval.

Signed December 13, 2021.

BY THE COURT

David Barlow
United States District Judge

27